Good afternoon, Your Honors. My name is John Sheridan, representing Wanda Davis. I'd like to reserve five minutes for rebuttal, if I may. You may do so, but please watch the clock. You control your own time. I will. Thank you. We are here to ask the Court to overturn the summary judgment dismissals of the trial court regarding Ms. Davis' state claims, as well as her claim under Section 1983. We think that the trial court below used much too harsh a standard in evaluating the evidence with which she was presented. The test for the state law case, for the state law claims, is basically as announced in Davis v. West One, which is that if there are reasonable competing inferences of both discrimination and nondiscrimination, the case needs to go to the jury. Well, we think that there is a tremendous amount of evidence under whatever analysis you choose to use, the direct method or the shifting burden analysis. And also, can I just ask one threshold question? With respect to claims that predate August 28, 2003, is there still an issue with respect to whether they're time barred or not? Only with regard to the harassment claims. Remember, this is a claim simply under state law. And the way that the case law has developed in Washington State is basically we've chosen to follow the Glasgow case. The Glasgow case is basically our anchor case. There's a case that came out named Robel in around the 2003 or 2001 time frame that could have, at that time, chosen to abandon the analysis of Glasgow, but it actually reaffirmed it. We did adopt the Morgan standard, but again, with the Glasgow analysis in it. So what we've done in Antonius is we've said this, that if you have a series of events, and it says that they may be events that you can't bring to the attention or that you couldn't bring a claim for disparate treatment on, not shall, but may, you look at the totality of circumstances under Glasgow, and you decide whether or not they are sufficiently related so they are just one big claim. And that one big claim spans as many years as we can show. One of the things that's important in Antonius is in Antonius the court said that you could have a gap of several years and you could still have a claim. So what we have here are we have ongoing behavior that actually begins after Wanda Davis comes back from having filed her lawsuit in 1995 against the city. Was that lawsuit a discrimination case? Yes, it was. It was actually, the facts are horrible. I read the facts, but what I'm trying to find out was what kind of case it was. Yes, it was. It was brought into state law. Was that a battery case? No, it was a discrimination case. There may have been a battery component, but it was a discrimination case. And that case, basically after that case settled in 1995, she came back to what was a very hostile workforce. And the thing that is so factually surprising is that Paul Weintraub, who's a manager from back in those days all the way to 2007, a manager who is linked to pretty much every step of her progress or lack of progress, is somebody who testified at his deposition in this case, but he still more than a decade later holds animus against her. Yes, and that being the case, it would be helpful to me for you to walk us through what Weintraub had to do with the later incidents. And let's use the ones after 2003. I'm somewhat dubious that you can string together a series of things that were separately actionable and then turn them into a current harassment claim. So let's assume we're talking 2003. And let me also just warn the Court that one of the reasons that this all gets tied together is because, as you know, we start with the Jo Bell incident in 2001. Jo Bell writes her up for what's called a written verbal warning. So that verbal warning gets cited in the discipline in 2005 as a basis for suspending her. I understand. So it is all linked. That's not a harassment issue. No. That has to do with whether the later... If we look at it, I think if you look at her declaration around the... Are you saying that her suspension was in some sense pretextual? The 2006 suspension? Yes. That sort of amazes me. Maybe I misunderstood the facts. Sure. I must have for you to think that's pretextual. I thought what happened was that she and another employee, Richards, let Davis's, I think it was her daughter's fiancee, into the restricted substation and let him climb a pole, even though he's not an employee and hasn't passed any of the certifications. That's the 2007. That's a difference. That's a difference. Oh, you're talking about the difference. The 2006 suspension is something that we were talking about at the time. I'm sorry. On that 2007 suspension, the way the record looked to me, and I'm sure you can educate me on this, is that she got harassed, she requested that something be done about it. Something was. She got transferred to a different crew. She got more overtime than a lot of other people, and even though some people may not have liked her because of her sexual orientation or something else, nevertheless, no adverse job actions were taken on account of it. And then an adverse job action was taken after this substation incident. What am I missing? Okay. I want to make sure I'm answering your question, Your Honor. Basically, if you want me to begin with the harassment, the harassment begins with Mr. Weintraub going back to the Joe Bell incident. He is actually present there for that. So he's guiding Joe Bell. When Smith Graham becomes her supervisor, Smith Graham takes the position, and remember there's some mendacity here. We have some conflicting testimony. Mr. Corling, Manager Corling says she said she doesn't trust Ms. Davis. Ms. Smith Graham testified that I wouldn't say necessarily trust was an issue. There are out-of-class denials in 2006 where Ms. Davis doesn't even make the cut because of Mr. Weintraub. He's the one screening the resumes. Mr. Weintraub is there for the horn expectations thing, which is that suspension I was talking about that precedes the demotion. What do you mean he's there? You mean he's in a supervisory capacity? What do you mean there? Yeah. Well, going back to Joe Bell, he's sort of Joe Bell's advisor because Joe Bell's new. Under Smith Graham, he is her right-hand man. He is the person who implements her policy. With the out-of-class denials, he is sitting in to make decisions as to what resumes make the cutout for out-of-class. But in the end, she has a really hard time making that claim because she had as much or more out-of-class work as most people. Well, you know what? The out-of-class actually increases after the lawsuit is filed. But if you look at those numbers beforehand, she is turned down on out-of-class. As a matter of fact, I think the city admits that she's actually not given out-of-class for a period of time because of the investigation. I think the strongest issue is the 2006 suspension. So I'd like to hear about that. Yes. The 2006 suspension results ñ she did nothing wrong. It is our position, and I should say this for both Judge Kleinfeld as well, it's our position she did nothing wrong to justify suspension in 2006 or demotion in 2007. In 2006, she is a crew chief, and she's going to read what's called expectations, which is basically the booklet. And she had authority from her supervisors. She did. Who's Weintraub? Who's Weintraub. He specifically says, he tells them, he says, go do it. Right. And then she goes and she does it. And he filed a horn, the fellow who is the guy who hears it. And remember, he's not even the first person she's read it to. She's done this to a prior person who was a problem on the crew. And so they read it. They do it in a private place in a way that is not embarrassing. They move him out of the way. And then she finds out he files this thing. And they do this investigation with a Ms. O'Hanlon who then, after the investigation, she joins the city attorney's office. But during the investigation, Weintraub unloads on her, the investigator, and says, I don't trust her because of her conduct with the lawsuit. So he tells her. It's in the record. She doesn't put that in her report. Instead, she takes these horrible things he says about her personality. She's vindictive, et cetera. When I deposed him, he said, I've done many investigations. I know that's not appropriate for an investigation. But he didn't hold back. He told this to O'Hanlon. And then she puts that in the report and it becomes a credibility attack on her. Keep in mind that that report that gets her suspended, it pertains to a 2002 evaluation that he complains about in his EEO complaint. She is getting suspended in 2006 for conduct that goes back to 2002. I couldn't bring a claim like that. But the city brings that against her. And we say that's evidence of disparate treatment and retaliation. So what do they do? Paula Rose, who was her suit. The issue about the earlier complaint was that she didn't write it, but had other people write it. The evaluation, you mean? Right. Yeah, the evaluation. Right. That's how the city spun it. But Paula Rose, who was her supervisor in 2002, she said in her deposition, I don't think she did anything wrong. Why wasn't that in the report? See, that's part of our 1983 claim and our municipal liability claim, is that the city has orchestrated these investigations to favor Caucasian heterosexual men. But is there anything specific with respect to this particular incident that would connect it to sexual orientation? Well, only that she's openly gay. Or even gender, for that matter. Well, only that she's openly gay. My understanding of your major contention with regard to it is that it's connected to retaliation. Because Weintraub knows. Well, certainly to the extent that he can influence, he did in a negative way. So he is a person who has been around for a long time. And people who are newer, of course, I think it's reasonable to say they defer to him. And so here he's going to this person, O'Hanlon, and he's saying to her that, you know, this person is a vindictive, horrible person. And she's writing it in the report and naturally finding bad things about her. And then keep in mind that Carrasco is the ultimate decision maker in everything that happens. And he's not a hands-off guy. So there's none of this cat's paw stuff. He's a hands-on guy. He is a person who asks questions because they do those louder mill hearings. And he says in his decision to suspend her first and then to demote her later, he says, I think it was a fair and balanced evaluation. But each time Wanda Davis submitted rebuttal material that he then rejected. So it is him who is ultimately responsible. And keep in mind that under Personnel Rule 1.3, he is the only person who can suspend or demote. All of these issues that pertain to what are called major disciplinary actions, they're all about things that she is alleged to have committed. But also keep in mind the three people that we pointed out to the court, Kefkin, Horn, and Dunlap, people who also who are heterosexual men who never had to go through the process. Horn never had to go in front of Carrasco, even though under Personnel Rule 1.3, unless there was evidence that he delegated it, Carrasco was the one who had to decide that he didn't deserve to be suspended or demoted. It doesn't happen. They don't follow their procedures. That's more than about two minutes. I know you wanted to reserve some time. Oh, I better stop. But we don't waive any arguments that we haven't made before. We understand that, counsel. Good afternoon. I'm Erin Overby for the city. My co-counsel, Mr. Bruce, would have a few minutes for comments on behalf of Mr. Carrasco, the individual defendant, and I understand that I'm in charge of the clock. Yes, just whatever you allocate among yourselves is fine so long as it doesn't exceed the full 15. Go ahead. Thank you. Certainly the city takes a very different view of the facts that were presented to this court, and to be fair to the court, it went through an amazing amount of analysis of a very detailed, very complicated record and really delved into who did what to whom, what the connections were or were not between the players, and ultimately decided that none of the facts that the plaintiff presented were enough to get her past summary judgment. And we maintain that there is a role for the court, even in discrimination lawsuits, even though we broadly construe our Washington State law, to get rid of the cases that don't belong in front of a jury. Could you be a little more specific and deal with the 2006, for example? With 2006? I'm sorry. Deal with the 2006 incident. The 2006 suspension. Is that what you're asking about, Your Honor? Yes. The 2006 suspension followed a detailed investigative report in which an apprentice had complained about discrimination that Ms. Davis was discriminating against him, and in order to respond to that She was discriminating against him by coming to his workplace because she was going on vacation. This is my understanding of the facts. Yes. And wouldn't be there when he started. And going to a private place, not doing anything in front of anybody, and essentially saying, you know, these are my expectations. She accused him of being a bigot, essentially. She said that we won't tolerate the way you behave towards people of our orientation, and it's not as though she was actually ordered to go. This guy, in his deposition, said things. It's said in his deposition that he thought that lesbians had a chip on their shoulder with regard to men. So her notion that he had some problem seems to have some basis in fact. Well, that could be, and yet it was the way in which she went about it. I mean, she did speak to him in a private location. She traveled across town and pulled him out of his workplace with his coworkers to talk to him, and he felt bullied, and I think the finding of fact was that it was unprecedented, that no one had treated someone in this way before. And she was also authorized by her supervisor to go there. Well, that's a strange contention to make, because I think what happened is Mr. Weintraub was approaching her, he was very busy, and he didn't object to her going. He said, that sounds fine. He didn't order her to go. If you look at the record, I don't believe that's what it says. He didn't order her, but he approved it. Well, he said, that sounds okay. I don't know if it's the same thing as ordering someone to go. I didn't say order. He approved it. Correct. Okay. Okay. So even if that's the case, I'm not sure that she fully explained to Mr. Weintraub what was going on, and let's not forget that Ms. O'Hanlon, in investigating the facts, cleared him of the most serious allegation, cleared her of the most serious allegation. He was charged with discrimination. He was charged with her discrimination. Ms. O'Hanlon found that that wasn't the case, but she did find that he, that she behaved in a way that was contrary to workplace expectations, and after that point in time, based on an independent investigation, Mr. Krosko didn't suspend her for two days. Also, do you agree that as part of this investigation, the investigator, who was a complete outsider, heard from Weintraub? The investigator was an outsider. Which had been triggered by her earlier lawsuit. I'm sorry, I didn't catch the last part. Could somebody infer that Weintraub told the investigator things that were based on what he said in his deposition, which is that he distrusted her because of her earlier lawsuit? I think what he said is that he disagreed in the way that she had behaved in her earlier lawsuit because after the employee who rubbed his open wound onto her had been fired, she went ahead and sued him as well, and that's what he said he didn't trust her. And he said it was his understanding that his supervisor or the person for whom he worked would never promote her for that reason. Did he say that too? I don't recall that being part of the record. So, and he also said something within this realm to the person who did the horrid investigation. He was interviewed as one of, I think, 17 fact witnesses, and he gave his opinion. I don't know that the opinion that he gave was decisive on how she came out in terms of her investigation, but I don't think the fact that Mr. Weintraub was interviewed as a witness indicates that he was responsible for the disciplinary action that was taken against her. And I would also note that I don't believe Mr. Carrasco, there's any evidence that Mr. Carrasco, if this was an act of retaliation, one would expect that somebody would have proved Mr. Carrasco was actually aware that Ms. Davis had filed this prior lawsuit or that she was gay if we're talking about orientation animus. I don't think there's any record there for that. So if this is a retaliation claim, a cause and effect, then there needs to be knowledge of the protected activity in order for her to prevail against summary judgment on a claim of retaliation. What was the inappropriate conduct exactly that she was disciplined for in 2006? It was the way in which she pulled Mr. Horn aside, and I think the essence of it was that she was bullying him. She knew that she wouldn't be working with him. In fact, she had gone to lengths to make sure that she wouldn't see him during his next rotation. I think there's evidence that they just simply did not like each other. Whether it was because of orientation or not, I don't know, but there's a record. But they wouldn't be working to each other. She went out of her way, drove across town, pulled him into a meeting, and accused him of being biased towards her, and this upset him. So it was basically a bullying charge. The record here is overwhelming, and it's hard to find anything. Tell me where to look for that. That's a first-hand thing. Okay, let me see if I can get you there. I think that was a problem the district court raised. I'm sorry? That was a problem the district court raised, too, that it's hard to use the record in this case. It is very difficult to find things. I don't want you to take a lot of your time. I thought you'd probably just have a tab on it. I'm sorry. Mr. Sheridan may have. Do you have the source? Yes, Your Honor. DR-8. 818 begins the narrative. Thank you. Counsel, is that right, 818? That's probably in the realm of where we'd be looking for records. That's a declaration of Wanda Davis. No, that isn't what I want. I want to know when they say, here's what she did, I want to see what the report says she did. Oh, the O'Hanlon report is what you're asking for then. All right. Let me see if my co-counsel can find it. It seems to be around pages 84 of the ER. And in any case, that is the basis for Mr. Carrasco's disciplinary action against him. Does that report say that she asked her supervisor whether she should go over there and then he said whatever you said he said? Does that sound fine? It does include her side of the story, yes. The O'Hanlon report includes all of Ms. Davis' claims as well as the comments of the other witnesses that she investigated. So, yes, that is part of the analysis and part of the review of the facts. Well, actually, what I see is it says that she approached Mr. Weintraub, informed him that he made offensive comments to her and Ed Richards about gays and she's concerned he might still feel that way. So she informed Mr. Weintraub of her intention to have an expectations meeting. It was not at his request that she held the expectations meeting, but it doesn't say that he said that's fine. I think Mr. Weintraub said that in his deposition, actually. Right. Okay. So it's not really a complete story. Go ahead. In any case, Ms. O'Hanlon's report was the basis for Mr. Carrasco's disciplinary decision, and I think it's really her burden to show that he imposed that discipline for an improper reason, either because of her gender or because of her orientation or if it's retaliation because of her lawsuit that was filed in 1994-95. And I don't think there's any evidence that ties that decision to any of those statuses, and I think that's the problem for her on maintaining that that is an improper action. And I think another way she could prove that would be to show that other people had engaged in similar behavior and not been treated the same way, and I don't think there's any evidence of that either. I guess the question is whether it would be a sufficient showing of pretext if they had given a reason, if this incident appeared to be a strange explanation for, an inadequate explanation for a two-day suspension. Okay. Do you think there has to be a comparator or can simply be it just seems odd in its face and there is some reason to believe that there was some retaliatory information that was included that influenced the decision-maker? Not the decision-maker, the investigator. You're saying that it just seems odd on its face that the level of discipline here  Well, to me it just reads really peculiarly that somebody goes over and does something that she asked her supervisor about and he said, that's fine, go do it. And she did it, and then they say, this is the reason why we're giving you a two-day suspension. Okay. And I agree with you that there won't be comparators in every case, but I think if she had evidence of other people who had done the same thing and they got off with a hand slap, that would be great evidence for her of disparate treatment. We don't have that here. So I suppose the court could take notice of that. And I guess I would go back to saying that I think even under Washington State law and the laudable goal of avoiding discrimination in the workplace, that you need more than just a weak issue of fact to get beyond summary judgment. And I don't think that that alone on its face is enough. Suppose we thought this was a problem. What would the consequence be? I'm leaving aside the later demotion. It's just this two-day suspension. What were the consequences of that for her, other than I guess she lost pay for two days. What else? That's correct. She lost pay for two days. I don't ‑‑ she went on in her same job. Was she with promotion opportunities or added class opportunities or anything else? No, she was considered for promotions after that. I think the record is pretty clear that she applied for supervisor positions. She actually scored quite well. She was passed on to the second round in all those interview processes. So it certainly didn't hold her back from being competitive. And I don't think there's any evidence that it precluded her from getting out-of-class assignments. In fact, her claim is, as I understand it, that the out-of-class assignments were less under Mr. Ivey because he had some kind of animus against her, either because of her orientation or because of her sex. And that happened in 2004 to 2006. I don't believe there's any claim that she was denied out-of-class opportunities for that. So the later problem after her demotion, she was precluded from having promotions and out-of-class assignments was not true because of the suspension. Not true because of the suspension. That is correct. I am going to sit down and give my co‑counsel a brief amount of time. Thank you, counsel. Thank you. Good afternoon. My name is David Bruce. I'm representing Jorge Carrasco. And I have asked to speak separately just to emphasize that Mr. Carrasco's liability is not the same as or coextensive with that of the city. Mr. Carrasco does not carry respondeat superior liability. He's only liable for any discrimination or retaliation that he personally engaged in. And on that note, I want to just very briefly address the incident that the court is most interested in here. Now, I'll have to say that the record is overwhelming. And you've already asked the two people who know more about this record than I do your questions. I will point to page 31 of the appellee's brief, which I know the court has already looked at, but on that page are various citations into the record, mostly in the 2090s and the 1030s. It is possible that those pages have Ms. O'Hanlon's report, which I know would be of interest to the court. If it's not there, we'll try to find it and advise your clerks in an appropriate manner. Mr. Carrasco didn't join Seattle City Light until 2004. He was not privy to the by then ancient history of the mid-90s, and I submit cannot possibly have been retaliating against Ms. Davis with respect to some much earlier incident in the imposition of this discipline. I'd also suggest this. I take some of the questions of the court to suggest that the two-day suspension seems a bit much for what Ms. O'Hanlon seems to have found. Now, that is not the same thing as finding that it was discriminatory. And I'd point out that- No, but it would support a pretext finding, would it not? Actually, I think not, because the first step, of course, is to show a prima facie case. And to show the prima facie case, you do have to show that someone not in the protected class was not treated in a similar manner. Moreover, and this is the one point I'd like to make before I run out of time, Ms. Davis had remedies at the time. You know, if the suspension was so disproportionate, she could have pursued a grievance with and through her union process and the union bargaining process or a civil service appeal. That's how she charged. That's how she chose to deal with it. But there are remedies to challenge any disproportionality. To show discrimination, you've got to show a comparator who was not similarly treated. Well, that's not true. I mean, that's one way to prove a case, but it's not the only way. I think I'm out of time. Thank you, counsel. Mr. Sheridan, you have some reserved time. Thank you very much. I just wanted to point you to ER 1969, which is a few pages before and several pages after the O'Hanlon investigative report. I also wanted to just note that the conduct that Ms. Davis allegedly did that caused her to get suspended in 2006 happened to her. When she was actually sitting at a table, her manager came to her and handed her the envelope that told her she was going to be disciplined. And her manager wasn't in any way found to have done anything wrong as a result. So I think all of that conduct that shows that they're acting in a way that is inconsistent with either good business practices, their own procedures, all of those things argue against summary judgment. It's real important, I think, to always admit. I had a question about the thing with the person that she thought was a bigot. When I looked over the report, it looked as though she was saying, I don't want him assigned to my crew because he filed a complaint against me for discrimination. It seems like the retaliation is by her against him for a protected activity. She's retaliating against him by not letting him get the employment opportunity. Actually, that's not chronologically correct. He'd been on the crew once before. This is Horn. When he was on the crew before, he was sort of giving her ultimatums, which are in the record. So that's why she went to Weintraub when he was coming back, because these apprentices do these short, several-week-or-month rotations. Weintraub, I don't actually see why saying, yeah, you can go talk to him, really solves the problem, because it's how you talk to him that matters. I guess if there's a question of fact as to how she talked to him, it ought to be resolved by the jury, because her testimony is that she acted professionally. Keep in mind she's a crew chief. She's doing her job with an employee who has a record of disobedience with his management. He filed a complaint against her, protected activity for discrimination, right? Afterwards. Yeah. Yeah, after. Not before that, after that, and all pertaining to that. So that's what it was. I just wanted to make a quick point about Mr. Krosko, and that is that. I was looking at this thing. I told Frank I was concerned about Carl coming to the crew because of Carl's previous threats to file an EEO complaint against him. That was the ultimatum that happened the last rotation. He wanted to get off her crew. That's a different fact pattern, but it is what leads to her giving expectations to him. But that's dealt with in detail in her declaration, and it's dealt with beautifully in detail. Is that protected activity to say, if you don't quit discriminating against me I will file an EEO complaint? That would be protected activity, yes. However, you know, Mr. Horn is the person who basically is the person who identified himself as thinking that gay people have a chip on their shoulder. So she was right when she said that he had some issues. If you look at his record, and it's in our brief, he had issues with other people, too. He has authority issues. She was just trying to be a good group. All right. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon